Barnes, Presiding Judge, dissenting.
The minor child R. S. T. has lingered in foster care for four years while her biological mother, who suffers from severe mental illness and cognitive deficits, has repeatedly rejected resources and thwarted attempts to facilitate a parental relationship with her child by cutting off visitation for an extended period and engaging in a pattern of belligerent and aggressive behavior toward others, including every case manager assigned to the case. The mother also has directed her erratic and belligerent behavior toward her own children during visitation and exhibited the same behavior during the termination hearing itself. While the biological mother has consistently undermined efforts aimed at building a relationship with her child, R. S. T. has bonded with her foster parents and refers to them as her mom and dad, and they wish to adopt her. Under these circumstances, there was clear and convincing evidence to support the juvenile court's finding that continued dependency was likely to cause serious physical, mental, emotional, or moral harm to the child and to terminate the mother's parental rights. Additionally, there was clear and convincing evidence to support the juvenile court's finding that the mother had abandoned R. S. T. and to terminate her parental rights on that alternative statutory basis. Accordingly, I would affirm the juvenile court's termination order and therefore respectfully dissent.[1]
"[O]n appeal from a termination order, we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated." (Footnote and punctuation omitted.) In the Interest of S. O. C. , 332 Ga. App. 738, 741-742, 774 S.E.2d 785 (2015). "[W]e neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened." (Citations and punctuation omitted.)
*631 In the Interest of S. C. S. , 336 Ga. App. 236, 245, 784 S.E.2d 83 (2016).
1. OCGA § 15-11-310 (a) (5) provides that in considering the termination of parental rights, a juvenile court must determine, among other things, whether the "continued dependency [is] likely to cause serious physical, mental, emotional, or moral harm" to the child. In making this determination, "the court must consider not only the likelihood of harm if the child remains indefinitely in foster care, but also the likelihood of harm if the child returns to the custody of [her] parent, notwithstanding that the deprivation persists." In the Interest of C. L. , 315 Ga. App. 607, 611-612 (1) (d), 727 S.E.2d 163 (2012) (whole court). As we have noted, "however, the same facts authorizing a finding that deprivation is likely to continue may also authorize a finding, under the circumstances of an individual case, that the continued deprivation is likely to cause serious harm." (Emphasis omitted.) In the Interest of J. E. , 309 Ga. App. 51, 57 (1) (d), 711 S.E.2d 5 (2011) (whole court). Furthermore, evidence that the child would likely suffer serious harm if returned to the parent also may "support a finding that the parent's relationship with the child, or lack thereof, is such that maintaining the status quo of foster care with a continued parental relationship would also be harmful." In the Interest of E. M. D. , 339 Ga. App. 189, 202 (2) (b), 793 S.E.2d 489 (2016).
The majority concludes in Division 3 of its opinion that while the record supports a finding that R. S. T. would likely suffer serious harm if she were returned to her mother, it does not support a finding that remaining in foster care would likely cause her serious harm. According to the majority, there was not clear and convincing evidence to support a finding that continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to R. S. T. under OCGA § 15-11-310 (a) (5).[2]
However, the same evidence reflecting that R. S. T. would likely suffer serious harm if returned to her mother also supports a finding that prolonging the parental relationship while the child remains in foster care would likely cause her serious harm. As we have indicated in our precedent, evidence that the parent suffers from profound mental health problems, combined with aggressive or violent behavior, is sufficient to support a finding that continued dependency will likely cause serious harm to the child under OCGA § 15-11-310 (a) (5). See In the Interest of O. B. , 337 Ga. App. 401, 404 (1), 787 S.E.2d 344 (2016) ; In the Interest of E.G. , 284 Ga. App. 524, 529 (1) (d), 644 S.E.2d 339 (2007) ; In the Interest of C. L. C. , 277 Ga. App. 297, 302 (1) (d), 626 S.E.2d 531 (2006) ; In the Interest of D. L. , 270 Ga. App. 847, 847-849, 608 S.E.2d 311 (2004). As we have explained, the aggressive or violent behavior of the parent towards others would authorize a juvenile court "to find that a clear potential exists that the [parent]'s demonstrated tendency toward violence could be directed toward the children in the future." In the Interest of D. T. A. , 318 Ga. App. 182, 184 (1), 733 S.E.2d 466 (2012).
That is the situation here. The record, viewed in favor of the juvenile court's ruling, reflects that the mother has ongoing, profound mental health problems and has been diagnosed by various therapists with anxiety disorder, depressive disorder, substance abuse, bipolar disorder, psychotic disorder, and a personality disorder. Moreover, the mother's scores on a test administered by one of the State's expert psychologists were consistent with someone who exhibits a pattern *632 of antisocial and high-risk behavior. The mother's cognitive test scores placed her in the second percentile of the range for intellectual functioning, and she was previously diagnosed with mental retardation. According to the State's expert psychologist, the mother has a lack of acknowledgment and insight regarding her mental issues, she does not have the cognitive resources necessary to care for a child, and she "lacks a basic understanding of what it takes to provide parenting at a minimally acceptable basic level." Moreover, the mother refused to see the mental health providers recommended for her treatment by the Department of Children and Family Services (the "Department"), and she has not consistently taken her prescribed medication for her mental health problems.
Additionally, there was extensive evidence of the mother's belligerent and aggressive behavior towards other people, including the State's expert psychologist and all of the Department case managers assigned to the matter. A prior order entered in March 2015 of which the juvenile court took judicial notice also reflected that two witnesses had observed the mother repeatedly cursing and screaming at her children and kneeing and shoving one of her other children during visitation. Moreover, the evidence of the mother's mental health issues and aggressive behavior was buttressed by the mother's own erratic and belligerent conduct in the courtroom during the termination hearing, which included the mother walking out of the courtroom on several occasions when she was unhappy with the testimony, refusing to answer certain questions on direct and cross-examination, and walking off the witness stand during the middle of her testimony, leading to the intervention of a courtroom deputy. See In the Interest of K. C. W. , 297 Ga. App. 714, 719 (2) (b), 678 S.E.2d 343 (2009) (juvenile court's finding that father was mentally deficient was "buttressed by the court's own observations of the father's testimony and demeanor at the termination hearing"); In the Interest of A. M. L. , 242 Ga. App. 121, 123 (1) (c), 527 S.E.2d 614 (2000) (mother's courtroom demeanor and behavior "demonstrated ongoing mental problems").
This evidence of the mother's profound mental illness and cognitive deficits, combined with her longstanding pattern of belligerent and aggressive behavior towards others (including Department case managers and her children during visitation), was sufficient to show that continued foster care with an ongoing parental relationship would likely cause serious harm to R. S. T. See In the Interest of O. B. , 337 Ga. App. at 404 (1), 787 S.E.2d 344 ; In the Interest of E.G. , 284 Ga. App. at 529 (1) (d), 644 S.E.2d 339 ; In the Interest of C. L. C. , 277 Ga. App. at 302 (1) (d), 626 S.E.2d 531 ; In the Interest of D. L. , 270 Ga. App. at 847-849, 608 S.E.2d 311. However, even if we were to assume that the mother's mental problems and aggressive behavior were insufficient to show that remaining in foster care with continued visitation would likely result in serious harm to R. S. T., there was additional evidence presented that supported such a determination.
"[O]ur Court has recognized, in case after case, that children should not be required to linger unnecessarily and indefinitely in foster care, inasmuch as children need permanence of home and emotional stability, or they are likely to suffer serious emotional problems." (Citations and punctuation omitted.) In the Interest of C. L. , 315 Ga. App. 607, 612 (1) (b), 727 S.E.2d 163 (2012) (whole court). Here, the record reflects that R. S. T., almost four years old by the time of the termination hearing, was removed from the mother's care shortly after her birth and remained in foster care over the ensuing years, except for a few weeks when the mother had temporary custody of the child before the child was removed again from her care. The mother reduced her amount of visitation with R. S. T. in September 2013 and then refused to visit the child altogether from June 2015 to March 2016, which raised concerns about her bond with the child, according to the State's expert psychologist.
Moreover, the State's child psychologist with an expertise in attachment and bonding testified that R. S. T. had a secure attachment[3] with the foster parents who wish to *633 adopt her, referring to them as her mom and dad, and she opined that visitation is important to maintain a bond between a parent and child. The child psychologist further testified that between the ages of approximately 18 months and 4 years (R. S. T. was 3 years 9 months old on the date of the juvenile court's termination order),
[d]isrupting an attachment can cause trauma, and children generally will react to that in terms of depression, feelings of hopelessness. They sort of go through those stages or grief. First is protest, second is anger. Then depression, then acceptance. And it's a traumatic process for them to break an attachment at this age.
The child psychologist further opined that
were a child of this age to be removed, I think the potential and the research has supported that there are greater incidents of juvenile delinquency, disruptive attachment in forming friendships, disruptive attachment in forming, or disruptions in forming attachments to further figures in adult relationships. Potential for depression, potential for anxiety, and diminished coping skills.
According to the child psychologist, if R. S. T. "doesn't have permanency then the potential for breaking the attachment she has to her foster parents will be a problem for her."
In light of this record, there was clear and convincing evidence that remaining in foster care likely would seriously harm R. S. T., and thus sufficient evidence for the juvenile court to find that continued dependency will cause or is likely to cause the child to experience serious physical, mental, emotional, or moral harm under OCGA § 15-11-310 (a) (5). See In the Interest of T. A. H. , 310 Ga. App. 93, 97 (3), 712 S.E.2d 115 (2011) (evidence of bond between children and foster parent who wished to adopt them, plus evidence that children had been in foster care for most of their lives and had been harmed when in the custody of their mother, was sufficient to support a finding that continued deprivation was likely to seriously harm the children, given that courts are "authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care") (citation and punctuation omitted). See also In the Interest of D. T. A. , 318 Ga. App. at 184 (1), 733 S.E.2d 466 (evidence of mother's anger issues and violent tendencies and failure to fully comply with case reunification plan, combined with fact that she "had not been able to maintain a meaningful and consistent bond with [her] children" and the "well-established principle that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems," was sufficient to support finding that continued deprivation would likely cause serious harm to her children) (citation and punctuation omitted).
Our law does not require that the child suffer actual harm in foster care before the State is permitted to intercede and terminate a dangerous parent-child relationship, and this Court should not place an evidentiary burden on the State so high that it creates a de facto requirement that a child exhibit psychological or physical harm before parental rights can be severed. See In the Interest of A. S. H. , 239 Ga. App. 565, 571 (1), 521 S.E.2d 604 (1999) (juvenile court "is not obligated to ... wait until the children actually have been harmed before terminating the parent's rights") (emphasis in original). As our General Assembly has emphasized, one of the purposes of the Juvenile Code is "[t]o eliminate the need for a child who has been adjudicated as a dependent child to wait unreasonable periods of time for his or her parent to correct the conditions which prevent his or her return to the family." OCGA § 15-11-260 (a) (2). To have R. S. T. continue unnecessarily and indefinitely in foster care when she could be adopted by her foster parents contravenes that clear legislative purpose. I therefore would affirm the juvenile court because there was sufficient evidence to support the court's finding and judgment that all of the factors for terminating the mother's parental rights under OCGA § 15-11-310 (a) (5) (including the requirement *634 of continued dependency likely causing serious harm to the child) were satisfied in this case, and sufficient evidence that termination was in the best interest of the child pursuant to OCGA § 15-11-310 (b).[4]
2. The juvenile court's termination order also should be affirmed based on the court's finding of abandonment, which is supported by clear and convincing evidence in the record.
OCGA § 15-11-310 (a) provides that "[i]n considering the termination of parental rights, the court shall first determine whether one of the statutory grounds for termination has been met[, including that] (4) [a] child is abandoned by his or her parent[.]" Abandonment is defined in the Juvenile Code in OCGA § 15-11-2 (1), which provides in pertinent part that
"[a]bandonment" or "abandoned" means any conduct on the part of a parent, guardian, or legal custodian showing an intent to forgo parental duties or relinquish parental claims. Intent to forgo parental duties or relinquish parental claims may be evidenced by: (A) Failure, for a period of at least six months, to communicate meaningfully with a child; (B) Failure, for a period of at least six months, to maintain regular visitation with a child; (C) Leaving a child with another person without provision for his or her support for a period of at least six months; (D) Failure, for a period of at least six months, to participate in any court ordered plan or program
designed to reunite a child's parent, guardian, or legal custodian with his or her child; ... or (H) Any other conduct indicating an intent to forgo parental duties or relinquish parental claims.
Here, the State argued in the juvenile court that the mother had abandoned R. S. T., and in addition to finding that the standard for termination under OCGA § 15-11-310 (a) (5) had been met, the court "further [found] that the child ha[d] been abandoned by [the mother] pursuant to [OCGA] § 15-11-2 and [OCGA] § 15-11-310."[5] Specifically, the juvenile court found that
[t]he mother has failed to develop and maintain a parental bond with the child in a meaningful, supportive manner for a period in excess of six months prior to the hearing on the petition for termination of parental rights.
The mother has without justifiable cause failed to provide for the care and support of the child as required by law for a period in excess of six months prior to the hearing on the petition for termination of parental rights[; and]
The mother has without justifiable cause failed to comply with a court ordered plan designed to reunite the child with the mother for a period in excess of six months prior to the hearing on the petition for termination of parental rights.
The juvenile court further found that
[t]he mother declined supervised visitation with the child for several months beginning in May 2015. The mother has seen the child once in the last eight (8) months, in March 2016. The Department offered supervised visitation with the mother and the child at the Department's office, which the mother declined. The mother testified that she sought to re-engage visitation in January 2016, but was unable to visit until March 8, 2016[,] because the offered location at the Department's office was inconvenient. Once the visits
changed location to *635 the courthouse, the mother did visit one (1) time with the child.
As an initial matter, the mother has failed to enumerate as error and challenge on appeal the juvenile court's determination that the evidence supported a finding of abandonment by the mother as a statutory ground for terminating her parental rights. Therefore, the mother has waived on appeal her right to challenge the juvenile court's finding as to this ground. See, e.g., In the Interest of E. G. M. , 341 Ga. App. 33, 49 (2) (a), 798 S.E.2d 639 (2017) ; In the Interest of B. M. L. , 239 Ga. App. 511, 512, 521 S.E.2d 448 (1999). Cf. Hewitt v. Community & Southern Bank , 324 Ga. App. 713, 716 (2), 751 S.E.2d 513 (2013) ("Grounds that are not attacked as erroneous will not be considered on appeal and are presumed to be binding and correct. An appellant's failure to attack alternative bases for a judgment results in the affirmance of that judgment.") (citation and punctuation omitted); Marks v. State , 280 Ga. 70, 75 (4), 623 S.E.2d 504 (2005) (holding that failure to enumerate on appeal a ruling as error will result in waiver of the claim). Nevertheless, the juvenile court's findings in support of termination based on abandonment of the child, OCGA § 15-11-310 (a) (4), are supported by the record.
The Department's case manager from October 2012 to May 2015 testified that the mother had not provided any financial support for the child since the child entered foster care, and despite the case manager's attempts to talk to the mother about paying child support, the mother stated a number of times that she was not going to pay it. The case manager also confirmed that other than a few weeks in late 2013, the child has never lived with the mother.
The Department's case manager from May 2015 to November 2015 when the case was assigned to adoption testified that the mother did not visit with the child between May 2015 and November 2015. Despite the case manager speaking with the mother about visitation and providing her with a MARTA card to facilitate transportation in the month of July 2015,[6] the mother consistently refused visitation because it was supervised. The case manager further testified that while she was the case manager the mother paid no child support, nor did she send any cards, gifts, or letters to the child.
An adoption case manager was assigned to the case in November 2015. She testified that the mother made no visits to see the child in November or December 2015; that the mother did not visit the child for Christmas and did not send any cards, gifts, or letters during that time. The mother also admitted to continued marijuana use. The adoption case manager confirmed that the mother did not visit the child again in January or February 2016 but did schedule a visit for March 8, 2016, and every other Tuesday thereafter. Nevertheless, after the lone visit on March 8, the mother did not exercise any other visits with the child. The adoption case manager also confirmed that the mother paid no child support.
While the mother claimed to have spoken briefly to R. S. T. on the child's birthday and to have given her gifts at Christmas, the mother admitted that she only visited with the child one time because she wanted visitation changed to unsupervised visitation. Finally, the mother's licensed professional counselor testified that she was aware that the mother had stopped visiting with the child after May 9, 2015, and counseled her against it, but the mother did not heed her advice.
Accordingly, I would affirm the juvenile court's order terminating the mother's parental rights on the additional ground that the record supports the juvenile court's findings and conclusion that the Department established grounds for termination based on the mother's abandonment of R. S. T. pursuant to OCGA § 15-11-310 (a) (4)[7] and sufficient evidence to support the juvenile court's conclusion that termination was in the best *636 interest of the child pursuant to OCGA § 15-11-310 (b). I therefore respectfully dissent to the majority's decision in this case.
I am authorized to state that Presiding Judge Doyle, Presiding Judge Ellington, and Judge Andrews join in this dissent.

See supra footnote 1. The same factors discussed in the majority opinion and this dissent that show the mother's parental misconduct and inability-combined with the fact that the foster parents wish to adopt R. S. T. and the guardian ad litem's opinion that adoption would be in the child's best interest-also support a finding that termination of the mother's parental rights would be in the best interest of the child. See In the Interest of B. D. O. , 343 Ga. App. 587, 592 (2), 807 S.E.2d 507 (2017) ; In the Interest of B. J. F. , 276 Ga. App. 437, 443 (2), 623 S.E.2d 547 (2005).

Given the specific language in the termination order reflecting that the juvenile court "further" found that the evidence supported a finding of abandonment, it is clear that the court intended to find both abandonment and dependency as a statutory ground for termination. Hence, the present case is unlike In the Interest of J. A. B. , 336 Ga. App. 367, 370, 785 S.E.2d 43 (2016), where we could not "determine from the juvenile court's order whether it intended to find abandonment, dependency, or both as the statutory ground for termination."

The case manager did not provide any additional MARTA cards because the mother was not complying with services and refusing to participate in a psychological parental fitness evaluation through a Department provider.

See In the Interest of B. D. O. , 343 Ga. App. 587, 590-591 (1), 807 S.E.2d 507 (2017) (upholding a termination for abandonment because evidence showed the father had not paid child support, had not seen the child for a year, had failed to legitimate the child, had moved without consulting the Department, and had failed to attend the vast majority of scheduled visits with the child). We note that In the Interest of L. S. , 244 Ga. App. 626, 627 (1), 536 S.E.2d 533 (2000), which is cited by this Court in In the Interest of B. D. O. , contains a citation to prior case law in which this Court stated that "[i]n order to find an abandonment, there must be sufficient evidence of an actual desertion, accompanied by an intention to sever entirely, so far as possible to do so, the parental relation, throw off all obligations growing out of the same, and forego all parental duties and claims." As this Court noted in In the Interest of A.W. , 240 Ga. App. 259, 262 n.4, 523 S.E.2d 88 (1999), that language was based on cases construing "the former OCGA § 15-11-51 (a) (1), which was repealed in 1986."