175 Ga. App. 475 (1985)
333 S.E.2d 445
IN RE S. G. T.
69764.
Court of Appeals of Georgia.
Decided July 12, 1985.
*482 Charles W. Smith, Jr., for appellant.
David Fox, Michael J. Bowers, Attorney General, H. Perry Michael, First Assistant Attorney General, Carol Atha Cosgrove, Senior Assistant Attorney General, David C. Will, Assistant Attorney General, for appellee.
BENHAM, Judge.
Appellant seeks the reversal of a juvenile court order terminating his parental rights with regard to an adopted son, S. G. T. Appellant challenges the severance of parental rights, alleging the insufficiency of the evidence as to deprivation (OCGA § 15-11-51 (a) (2)) and wanton and willful failure to support (OCGA § 15-11-51 (a) (4)).
In order to understand fully the precise legal issues, it is necessary to review the facts in some detail. Appellant married S. G. T.'s mother, who brought S. G. T. to the marriage. J. E. T. was born to the marriage, and appellant initiated proceedings to adopt S. G. T. The natural mother of S. G. T. and J. E. T. was killed in an automobile accident in 1977 when S. G. T. was five years old and J. E. T. was approximately one year old. The proceedings to adopt S. G. T. were concluded after the death of his mother. Appellant entered into his third marriage after the death of S. G. T.'s mother, separated from that wife and, in 1981, started living with his former housekeeper, *476 who had two minor children of her own. The original petition to terminate involved both J. E. T., appellant's natural child, and S. G. T., the adopted child.
Reports of physical abuse were made by an undisclosed source to the Hall County Department of Family & Children Services in 1979. An investigation disclosed that S. G. T. had suffered bruises to his face, had had emotional problems at school, and had expressed a desire to go home with his teacher rather than to return to the home of appellant. In testifying as to conditions at the home, the first caseworker observed an attitude by the father of open hostility and ridicule of S. G. T. However, according to the caseworker, the case was closed in 1980 due to a lack of progress.
In February of 1981, the case was reopened at the request of school officials, who reported an injury to S. G. T.'s stomach. On February 3, 1981, S. G. T. ran away from home because he feared punishment for receiving a poor report card. When first contacted on the night of the runaway incident, appellant expressed a willingness to let the 9-year-old child spend the night in jail; when contacted again the same night, he offered in the presence of the child to sign a waiver of his parental rights. On a subsequent occasion, appellant actually signed a consent to adoption, but withdrew it later. The child was subsequently placed in foster care with his maternal grandparents.
After hearing testimony, much of which came from appellant's estranged wife but was corroborated in many features by the children, the juvenile court severed the parental rights as to S. G. T. but refused to sever as to J. E. T.
1. Child abuse and neglect has proven to be one of the awesome enigmas of modern times, and while we have been able to make scientific achievements beyond our wildest dreams, we remain unable to guarantee freedom from abuse for our children. The law and the public policy of this state treasure the bond between parent and child, but, like any other treasure, forfeiture can occur when the conduct of the one who possesses the treasure is inconsistent with the treasured status. Such is the case here.
Where it is alleged that a child is deprived under OCGA § 15-11-51 (a) (2), "clear and convincing" evidence as to deprivation is required before termination of parental rights will be authorized. In re L. A., 166 Ga. App. 857 (305 SE2d 636) (1983). Cf. also Chancey v. Dept. of Human Resources, 156 Ga. App. 338 (274 SE2d 728) (1980). The juvenile court was authorized to find that S. G. T. was emotionally abused and neglected by the father, who fought in the child's presence, dressed him in female clothing, and ridiculed him repeatedly. In addition, the court was authorized to find that the child was subjected to inappropriate and degrading discipline by being locked in the laundry room overnight and by being forced to eat soap and *477 drink beer. The court's finding as to physical abuse is supported by evidence that the father kicked the child, choked him, and banged his head against the wall. The requirements of OCGA § 15-11-51 (a) (2) as to deprivation were met, and such evidence was "clear and convincing." This evidence formed a valid basis for the juvenile court's determination of deprivation and thereby authorized the termination of parental rights. Roberson v. Dept. of Human Resources, 148 Ga. App. 626 (252 SE2d 57) (1979).
Great stock should be placed in those cases which acknowledge the juvenile court judge as the trier of fact and authorize this court to override his findings only in instances of abuse. Powell v. Dept. of Human Resources, 147 Ga. App. 251 (248 SE2d 533) (1978). See also In re Creech, 139 Ga. App. 210 (228 SE2d 198) (1976).
2. We agree with appellant in his assertion that no "wilfulness" was shown as to his failure to support. The statutory provision in question, OCGA § 15-11-51 (a) (4), provides as follows: "The court by order may terminate the parental rights of a parent with respect to his child if . . . a decree has been entered by a court of competent jurisdiction of this or any other state ordering the parent, guardian, or other custodian to support the child and the parent, guardian, or other custodian has wantonly and willfully failed to comply with the order for a period of 12 months or longer." Evidence of record shows that appellant regularly made court-ordered support payments until he was involuntarily laid off by his employer. In view of such evidence, appellant's failure to pay support cannot be characterized as willful and wanton throughout the entire 12-month period. In addition, the petition to terminate relied on deprivation rather than failure to support. While we find this enumeration meritorious, there was sufficient evidence to terminate on the deprivation issue; therefore, a reversal is not necessary.
Judgment affirmed. Deen, P. J., McMurray, P. J., Birdsong, P. J., Carley and Beasley, JJ., concur. Deen, P. J., concurs specially. Banke, C. J., Sognier and Pope, JJ., dissent.
DEEN, Presiding Judge, concurring specially.
While concurring fully with the majority opinion, observations in addition to those outlined in the majority and dissenting opinions should be noted. Testimony was given that for more than a two-year period, appellant would drink "a 6-pack, maybe two 6-packs, maybe more sometimes, a day"; he would require the child to sit on his knees and hold his hands out in front of him for hours at a time; appellant had been paralyzed in part and had to use the back of his hand in slapping at and bruising the child's face and body at least 13 times; he kissed the daughter passionately on the mouth "the way a man kisses a woman"; he abused the dog, Disco, and stated the way to *478 train a dog was to "tie him up and starve him to death and feed him gun powder"; he had lived with a housekeeper in an unmarried state with implications and possibilities of criminal fornication occurring; the housekeeper testified that he placed his hands on her throat, choked her, beat on her, mistreated the children and broke her nose, necessitating that she go to the emergency room at the hospital, and on one occasion she had to be taken to the Gateway House for battered women.
All of this in its totality would add up to at least mental and physical child abuse, as well as abuse to the housekeeper and dog, and would justify and warrant a finding of parental unfitness. I would affirm the action of the Juvenile Court.
BANKE, Chief Judge, dissenting.
It is important at the outset to emphasize that the issue in this case is not whether the appellant should be re-entrusted with physical custody of his adopted son. Custody was already in the DFCS when the termination petition was filed, and no one appears to be questioning the propriety of that disposition. What we are dealing with is instead the complete severance of a 14-year-old child's relationship with the only parent he has known since he was three years of age, not to mention the child's relationship with his only sibling.
A complete termination of parental rights is authorized under OCGA § 15-11-51 (a) (2) only in the face of clear and convincing evidence of unfitness on the part of the parent, manifested either by intentional or unintentional misconduct resulting in abuse or neglect of the child, or by what is tantamount to physical or mental incapacity to care for the child. Chancey v. Dept. of Human Resources, 156 Ga. App. 338, 340 (274 SE2d 728) (1980). "A finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere. (Cit.) Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship." Carvalho v. Lewis, 247 Ga. 94, 95 (274 SE2d 471) (1981). (Emphasis supplied.) See also Blackburn v. Blackburn, 249 Ga. 689, 692-694 (292 SE2d 821) (1982). This strict evidentiary standard is constitutionally mandated in termination cases and is not lessened by the fact that the parent may already have lost temporary custody of the child to the state. Santosky v. Kramer, 455 U. S. 745, 753 (102 SC 1388, 71 LE2d 599) (1982).
If the evidence in this case clearly and convincingly demonstrated that the appellant was in fact guilty of the kind of abuse described *479 in the majority opinion, I would have no hesitancy whatever in voting to affirm the termination of his parental rights with respect to S. G. T., nor I venture to say, would anyone else. However, there are some inaccuracies and omissions in the majority's characterization of the evidence in this regard, and there are other factors which I believe militate strongly against a complete severance of the parent-child relationship.
The initial investigation conducted by the department in 1979 did not disclose that S. G. T. had suffered multiple bruises to his face, but that he "had a slight bruise above his nose," the origin of which was never determined. The DFCS caseworkers who were dispatched to the appellant's home at this time described it as being very clean and well kept, with ample food and clothing on hand for the children. Asked why she closed the case in 1980, the caseworker to whom the case was assigned at that time testified that she took this action not merely because of a perceived lack of progress but also "because I hadn't been out [to the appellant's home] as much as I should and I felt real guilty about it."
The primary concern of the DFCS caseworkers who testified in support of the termination petition does not appear to have been the threat of physical abuse by the appellant. Indeed, the department had been apprised of the possibility of physical abuse for two and a half years before obtaining custody, and another year and a half passed before the termination proceedings were initiated. Rather, the department's primary criticisms of the appellant were that he was very inflexible, tended to drink too much, did not openly display warmth or affection towards the child, and, at least after the child was placed in foster care, failed to attend scheduled counselling sessions. The caseworker who caused the termination petition to be filed in 1983 gave the following as her reasons for finally deciding to seek such a disposition: "The case has been open on and off, whatever, for almost four years or thereabouts. And there has been no progress made with [the appellant]. [The appellant] is very resistant. We have somewhat of a respect for each other sometimes but have had a difficult relationship in working with each other. [S. G. T. is] 12 years old." While the desire to reach some final resolution on a frustrating case which has been open for several years is quite understandable, it certainly should not be considered a valid basis for the termination of a parent's parental rights in his or her child.
This is not to say that the department did not present some chilling accounts of physical abuse by the appellant towards his adoptive son. However, I have great difficulty in accepting much of this evidence at face value. The bulk of it was provided by the appellant's estranged wife, who bore him an unmistakable personal animus, and many of her descriptions of alleged abuse by the appellant were so *480 extreme as to strain credibility to the breaking point. The juvenile court judge himself obviously did not place much reliance on this witness's testimony, for he made no reference to it in his findings of fact. Furthermore, much of this same evidence pertained equally to S. G. T.'s younger brother, with respect to whom the court found insufficient evidence to authorize termination.
Other testimony purporting to show physical and emotional abuse by the appellant was presented in the form of hearsay accounts by school personnel with whom the child had spoken some three years previously. However, a psychologist who had been commissioned by the department to evaluate the child testified that he suspected the child had a tendency in recounting such past experiences to make up some details and to exaggerate others in order to gain attention. Furthermore, the child himself denied on the witness stand that he had been subject to physical abuse by his father, with the exception of one occasion on which his father had hit him on the face for lying; and he further testified that it was his wish to return to his father's home, primarily so that he could be reunited with his younger brother.
It is quite apparent from the expert testimony in this case that the real problem to which the DFCS was responding in its bid to terminate the appellant's parental rights was not abuse in the classic sense. Rather, it was the fact that the child suffers from emotional problems which in all likelihood developed prior to the appellant's arrival on the scene and with which the appellant, due to personality problems of his own, is ill equipped to cope. While not wishing in any way to minimize the importance of this problem or to criticize the department's efforts to deal with it, I do not believe the appellant's shortcomings in this regard should be allowed to offset totally his positive contributions towards the child's welfare. As previously noted, the appellant has worked consistently and diligently over the years to provide for both his children, and he has also shown a consistent interest in their education. Is this, on balance, the profile of a parent whose parental rights ought to be completely and irrevocably terminated? I think not. Though I am reluctant to interfere with the discretion of an extremely able and learned juvenile court judge in such a matter, I simply do not find clear and convincing proof in this case of such compelling circumstances as would authorize the extreme sanction of termination. See generally Carvalho v. Lewis, supra. This does not mean that I am in disagreement with the majority in its concern over child abuse as a social ill in general. However, it is our duty to decide each case on the basis of the record before us rather than on the basis of the emotionally charged nature of the allegations or the severity of the social concerns represented by them. Based on a thorough examination of the record and transcript in an extremely close and troubling case, I must respectfully dissent to the termination of *481 the appellant's parental rights with respect to S. G. T.
I am authorized to state that Judge Pope and Judge Sognier join in this dissent.
POPE, Judge, dissenting.
I concur in the dissenting opinion of Chief Judge Banke and, based upon a thorough and painstaking review of the record, join in all which is set forth therein. The evidence in this case presents a close question necessitating a judgment call by the juvenile court, and, as shown by the number of separate comments here on appeal, provides a wealth of opportunity for divergent opinions. That is, however, the legal point upon which I would base a reversal. The applicable standard is "clear and convincing" evidence. The conflict in the evidence in this case simply does not reach that point.
I would also ground reversal on two additional points: one technical and one which is practical. From the order of the juvenile court, a genuine concern for S. G. T.'s need for the security of permanent placement is apparent. However, the language used shows that the juvenile court believed termination of the legal father's parental rights to be the only option for disposition of S. G. T. "Unless this Court grants the relief requested by Petitioner [DFCS], [S. G. T.] will be returned to the home of his adopted father. . . ." Alternative orders of disposition of deprived children are listed in OCGA § 15-11-34 (a). The juvenile court may find the child deprived and the parent "unfit" and, in the exercise of its discretion, decline to terminate parental rights. See Painter v. Barkley, 157 Ga. App. 69 (1) (276 SE2d 850) (1981). In the foregoing language of the juvenile court's order, it appears that the court felt no choice existed except termination of parental rights when, in actuality, such disposition is discretionary once deprivation and parental "unfitness" are found. For this additional reason, I would reverse. See Ray v. Dept. of Human Resources, 155 Ga. App. 81 (1) (270 SE2d 303) (1980). Further, from a practical standpoint, I do not believe that parental rights termination is in order to enable S. G. T. to be placed for adoption. Perhaps, in October 1983 at the time of the hearing on the petition to terminate the father's rights, S. G. T.'s placement for adoption was a realistic goal and possibility. However, in light of the passage of time due to judicial delay, routine and well-intentioned as it undoubtedly has been, the twelve-year-old boy who was the subject at the hearing is now almost fourteen years of age. Regrettably, I believe S. G. T.'s chance for adoption to be diminished at this point. With this in mind, as well as for the foregoing reasons, I concur in the dissenting opinion favoring reversing the juvenile court's order terminating parental rights.